# GROUP EXHIBIT 1

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF MICHAEL N. JACOBSOHN

I, Michael N. Jacobsohn, declare and say as follows:

1. I am an Attorney Adviser for the Office of Law Enforcement and Intelligence in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Tsvetomir Simeonov Simeonov. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Bulgaria are found in the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Bulgaria (the Treaty), signed on September 19, 2007, which entered into force on May 21, 2009. A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Embassy of the Republic of Bulgaria has submitted a request for the extradition of Tsvetomir Simeonov Simeonov by Diplomatic Note No. 1326, dated December 8, 2017. The Ministry of Justice of Bulgaria submitted additional information relating to this request to the United States Department of Justice by letter dated February 8, 2019. Copies of the diplomatic note and letter are attached to this declaration.

- 2 -

4. In accordance with Article 19 of the Treaty, the Government of the United States of America represents the interests of the Government of the Republic of Bulgaria in proceedings in U.S. courts in Bulgaria's extradition requests, and the Government of the Republic of Bulgaria provides similar representation in its courts with respect to extradition requests made by the United States.

5. The offenses for which the extradition of Tsvetomir Simeonov Simeonov is sought in relation to Case No. 317/2002 are covered by Article 2 of the Treaty. The offenses contained in Case No. 14/2005 are not forwarded to the court for consideration.

6. Pursuant to Article 9 of the Treaty, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in Sofia.

7. My office was formally presented with the request for the extradition of Tsvetomir Simeonov Simeonov on December 13, 2017. As is our practice, we immediately made a photocopy of the request in its entirety. A complete copy of the December 2017 submission (the "submission") is attached to this declaration. Due to an administrative issue, the original submission is not available for forwarding to the court. I hereby certify that the documents attached to this declaration are a full and true copy of the original submission which bore the certificate or seal of the Ministry of Justice, and thus complied with the Treaty with respect to authentication.

19031106-2

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

That Michael N. Jacobsohn, whose name is subscribed to the document hereunto
was at the time of subscribing the same Attorney Adviser, Office of the Legal Adviser,
of State, United States of America, and that full faith and credit are due to his acts as

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Michael R. Pompeo, Secretary of State ,
have hereunto caused the seal of the Department of State to be
affixed and my name subscribed by the Assistant Authentication
Officer, of the said Department, at the city of Washington, in the
District of Columbia, this sixteenth day of April, 2019.

Secretary of State

By

Assistant Authentication Officer,
Department of State

*Issued pursuant to CHXIV,
5, 1789, I Stat. 68-
657; 22USC 2651a;
28 USC 1733 et. seq.: 8
3(f); RULE 44 Federal Ru
Civil Procedure.*

- 3 -

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April  1 5  , 2019.

MICHAEL N. JACOBSOHN

Attachments:
1. Copy of note and letter
2. Copy of Treaty
3. Copy of submission

EXT-SIMEONOV-00004



EMBASSY OF THE REPUBLIC OF BULGARIA
WASHINGTON, DC

AMBASSADOR

L/LEI

2017 DEC 13  A 10: 45

DEPARTMENT OF STATE

Ref. № 1326

December 8th, 2017

The Embassy of the Republic of Bulgaria presents its compliments to the United States Department of State and has the honor to enclose herewith a request from the Ministry of Justice of the Republic of Bulgaria for the extradition from the USA of the Bulgarian citizen TSVETOMIR SIMEONOV SIMEONOV in accordance with the Extradition Treaty between the Republic of Bulgaria and the United States of America. The Embassy kindly requests the assistance of the Department of State in forwarding these documents to the United States Department of Justice for further action.

The Embassy of the Republic of Bulgaria avails itself of this opportunity to renew to the United States Department of State the assurances of its highest consideration.

**Enclosure:** Extradition request

**UNITED STATES DEPARTMENT OF STATE**
**WASHINGTON, DC**

1621 22nd Street, NW, Dimitar Peshev Plaza, Washington, DC 20008, Tel: (202) 387-577; Fax: (202) 234-7973
Web site: www.bulgaria-embassy.org; E-mail: office@bulgaria-embassy.org



# REPUBLIC OF BULGARIA
## MINISTRY OF JUSTICE

**Ref. № 99-H-E-15/07 dated 08.02.2019**

(Please quote)

0 8 -02- 2019

**U.S. DEPARTMENT OF JUSTICE**
**ATTN:**
**Margarita Pendarvis, Esq.**
**Contract Law Clerk**
**Office of International Affairs**
**U.S. Department of Justice, Criminal Division**
**1301 New York Avenue, NW, Suite 800**
**Washington, DC 20005**
**Tel: (202) 307-0646**
**Margarita.Pendarvis@usdoj.gov**

**Subject:** Extradition procedure from the U.S.A. of the Bulgarian national Tsvetomir Simeonov Simeonov, born on ▮▮▮▮▮

The Ministry of Justice of the Republic of Bulgaria presents its compliments to the U.S. Department of Justice and, regarding the extradition procedure of the person stated above, in compliance with the provisions of the Agreement on Certain Aspects of Mutual Legal Assistance in Criminal Matters between the Government of the Republic of Bulgaria and the Government of the United States of America, hereby has the honour to transmit to the competent American judicial authorities the following documents:

- Letter Ref. No Д-4/2005, dated 14.01.2019, of the Regional Prosecutors's office in Kazanlak;
- Letter Ref. No 284p-916-11.01.2019 of the Kazanlak Regional Police Department;
- Letter Ref. No 284000-1131, dated 14.01.2019, of the Kazanlak Regional Police Department.

Furthermore we would like to point that all of the furnished documents are accompanied by a certified translation into English language.

Regarding the aforementioned, we would like to kindly ask you to notify us about your approach to the so stated extradition procedure.

The Ministry of Justice of the Republic of Bulgaria avails itself of this opportunity to renew to the U.S. Department of Justice the assurances of its highest consideration.

**Enclosures:** As stated.

**DIRECTOR OF DIRECTORATE**
**"INTERNATIONAL LEGAL CO-**
**OPERATION AND EUROPEAN AFFAIRS":**

**BILIANA BELIAKOVA**

| 110TH CONGRESS 2d Session | SENATE | TREATY DOC. 110–12 |
| --- | --- | --- |

# EXTRADITION TREATY WITH BULGARIA AND AN AGREEMENT ON CERTAIN ASPECTS OF MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS WITH BULGARIA

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF BULGARIA (THE "EXTRADITION TREATY" OR THE "TREATY") AND THE AGREEMENT ON CERTAIN ASPECTS OF MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF BULGARIA (THE "MLA AGREEMENT"), BOTH SIGNED AT SOFIA ON SEPTEMBER 19, 2007



JANUARY 22, 2008.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

69–118 ★ (Star Print)          WASHINGTON : 2008

## LETTER OF TRANSMITTAL

————————

THE WHITE HOUSE, *January 22, 2008.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Bulgaria (the "Extradition Treaty" or the "Treaty") and the Agreement on Certain Aspects of Mutual Legal Assistance in Criminal Matters between the Government of the United States of America and the Government of the Republic of Bulgaria (the "MLA Agreement"), both signed at Sofia on September 19, 2007. I also transmit, for the information of the Senate, the report of the Department of State with respect to the Extradition Treaty and the MLA Agreement.

The new Extradition Treaty would replace the outdated Extradition Treaty between the United States and Bulgaria, signed in Sofia on March 19, 1924, and the Supplementary Extradition Treaty, signed in Washington countries on mutual legal assistance in on June 8, 1934. between the two criminal matters. The MLA Agreement is the first agreement Both the Extradition Treaty and the MLA Agreement fulfill the requirements for bilateral instruments (between the United States and each European Union (EU) Member State) that are contained in the Extradition and Mutual Legal Assistance Agreements between the United States and the EU currently before the Senate.

The Extradition Treaty follows generally the form and content of other extradition treaties recently concluded by the United States. It would replace an outmoded list of extraditable offenses with a modern "dual criminality" approach, which would enable extradition for such offenses as money laundering, and other newer offenses not appearing on the list. The Treaty also contains a modernized "political offense" clause, and it provides that extradition shall not be refused based on the nationality of a person sought for any of a comprehensive list of serious offenses. Finally, the new Treaty incorporates a series of procedural improvements to streamline and speed the extradition process.

Because the United States and Bulgaria do not have a bilateral mutual legal assistance treaty in force between them, the MLA Agreement is a partial treaty governing only those issues regulated by the U.S.-EU Mutual Legal Assistance Agreement, specifically: identification of bank information, joint investigative teams, videoconferencing, expedited transmission of requests, assistance to administrative authorities, use limitations, confidentiality, and grounds for refusal. This approach is consistent with that taken with the other EU Member States (Denmark, Finland, Malta, Por-

(III)

IV

tugal, Slovak Republic, and Slovenia) with which the United States
did not have an existing mutual legal assistance treaty.

I recommend that the Senate give early and favorable consider-
ation to the Extradition Treaty and MLA Agreement, along with
the U.S.-EU Extradition and Mutual Legal Assistance Agreements
and the other related bilateral instruments between the United
States and European Union Member States.

GEORGE W. BUSH.

EXT-SIMEONOV-00009

## LETTER OF SUBMITTAL

———————

DEPARTMENT OF STATE,
*Washington, November 1, 2007.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Bulgaria (the "Extradition Treaty") and the Agreement on Certain Aspects of Mutual Legal Assistance in Criminal Matters between the Government of the United States of America and the Government of the Republic of Bulgaria (the "MLA Agreement"), both signed at Sofia on September 19, 2007. Upon its entry into force, the Extradition Treaty would replace the Extradition Treaty between the United States and Bulgaria, signed at Sofia on March 19, 1924, and the Supplementary Extradition Treaty, signed at Washington on June 8, 1934. The MLA Agreement is the first treaty between the two countries on mutual legal assistance in criminal matters. The Extradition Treaty and the MLA Agreement fulfill the requirements of the Agreements on Extradition and Mutual Legal Assistance between the United States of America and the European Union, both signed on June 25, 2003, which were transmitted to the Senate on September 28, 2006, for implementing bilateral instruments between the United States and each member state of the European Union. The article-by-article analyses of the two instruments are enclosed in this report. I recommend that the Extradition Treaty and the MLA Agreement be transmitted to the Senate for its advice and consent to ratification. Both instruments are self-executing and will not require implementing legislation.

Respectfully submitted,

CONDOLEEZZA RICE.

Enclosures: Overviews and analyses of the provisions of the Extradition Treaty and MLA Agreement.

EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF BULGARIA

### OVERVIEW

The Extradition Treaty between the Government of the United States of America and the Government of the Republic of Bulgaria (the "Extradition Treaty" or the "Treaty") replaces an outdated 1924 extradition treaty, as amended by a 1934 supplementary treaty. This new Extradition Treaty also serves to implement, as be-

(V)

EXT-SIMEONOV-00010

VI

tween the United States and Bulgaria, the provisions of the Agreement on Extradition between the United States of America and the European Union (the "U.S.-EU Extradition Agreement"), currently before the Senate.

The following is an article-by-article description of the provisions of the Treaty.

Article 1 obligates each Party to extradite to the other, pursuant to the provisions of the Treaty, persons sought by authorities in the Requesting State for prosecution or for imposition or execution of a sentence for an extraditable offense.

Article 2, which is taken from Article 4 of the U.S.-EU Extradition Agreement, defines extraditable offenses. Article 2(1) defines an offense as extraditable if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of more than one year or by a more severe penalty. The approach taken in the Treaty with respect to extraditable offenses is consistent with the modern "dual criminality" approach, rather than the old "list" approach, and is one of the key benefits of the new Treaty. Use of a "dual criminality" clause, rather than the categories of offenses listed in the 1924 Treaty, obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws in both States and ensures a comprehensive coverage of criminal conduct for which extradition might be sought.

Article 2(2) further defines an extraditable offense to include an attempt or a conspiracy to commit, or participation in the commission of, an extraditable offense. The Parties intended to include, under the broad description of "participation," the offenses of aiding, abetting, counseling, or procuring the commission of an offense, as well as being an accessory to an offense.

Additional direction is provided by Article 2(3), which provides that an extraditable offense shall be an offense regardless of whether: (a) the laws in the Requesting and Requested States place the acts or omissions constituting the offense within the same category of offenses or describe the offense by the same terminology; (b) the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only; or (c) in criminal cases relating to taxes, customs duties, currency control or commodities, the laws of the Requesting and Requested States provide for the same kinds of taxes, customs duties or controls on currency or on the import or export of the same kinds of commodities.

With regard to offenses committed outside the territory of the Requesting State, Article 2(4) provides that extradition shall be granted in accordance with the provisions of the Treaty if the laws of the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws of the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may proceed with extradition provided that all other requirements for extradition are met.

VII

Article 2(5) provides that, if extradition is granted for an extraditable offense, it shall also be granted for any other offense specified in the request if the latter offense is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

Article 2(6) provides that, where the extradition request is for enforcement of a sentence, the deprivation of liberty remaining to be served must be at least four months.

Article 3(1) provides that extradition shall not be refused based on the nationality of the person sought, for any offense falling within a comprehensive list of 30 offenses. The list mirrors those offenses for which surrender of nationals by one member state of the European Union to another is mandatory under the European Arrest Warrant procedure. Under the Bulgarian Constitution, a treaty is required in order for Bulgarian authorities to surrender a Bulgarian citizen to another state for purposes of criminal prosecution. The United States is the first country outside the European Union with which Bulgaria has agreed to extradite nationals.

Article 3(2) provides that the Requested State additionally may choose to extradite a national for an offense not enumerated in paragraph 1. In the event that the Requested State denies extradition on the sole basis of nationality with respect to an offense not enumerated in Article 3(1), under Article 3(3) the Requested State shall, at the request of the Requesting State, submit the case to its competent authorities for prosecution. Under Article 3(4), the Parties also may agree to expand the list in paragraph 1 at a future time.

Article 4 governs political and military offenses as a basis for the denial of extradition. As is customary in extradition treaties, Article 4(1) provides that extradition shall not be granted if the offense for which extradition is requested constitutes a political offense. Article 4(2) specifies five categories of offenses that shall not be considered to be political offenses:

(a) an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b) murder, manslaughter, malicious wounding, inflicting grievous bodily harm, assault with intent to cause serious physical injury, and serious sexual assault;

(c) an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(d) placing, using, threatening to use, or possessing an explosive, incendiary, or destructive device capable of endangering life, causing substantial bodily harm, or causing substantial property damage; and

(e) a conspiracy or attempt to commit, or participation in the commission of any of the offenses set forth in (a)–(d).

Article 4(3) provides that, notwithstanding Article 4(2), extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

Article 4(4) provides that the executive authority of the Requested State may refuse extradition for offenses under military

VIII

law that are not offenses under ordinary criminal law. Desertion would be an example of such an offense.

Article 5(1) precludes extradition of a person who has been convicted or discharged from proceedings with final and binding effect by the competent authorities in the Requested State for the offense for which extradition is requested. Article 5(1) adopts a similar formulation to the U.S.-Austria Extradition Treaty and clarifies that an acquittal for lack of jurisdiction, or a discharge for lack of jurisdiction, is not an obstacle to extradition.

Article 5(2) prohibits the Requested State from denying extradition solely based on the existence of criminal jurisdiction in the Requested State. Article 5(2) also ensures that the Parties will apply their domestic law on prior prosecution to give full force and effect to Articles 1 and 3 of the Treaty. Bulgarian criminal law allows for jurisdiction in a wide range of situations, including situations where the accused is a Bulgarian national but committed the crime abroad. In addition, Bulgarian extradition law permits denial of extradition where the offense for which extradition is requested falls within the jurisdiction of Bulgarian courts. Given these provisions of Bulgarian domestic law, Article 5(2) provides important protections to ensure that U.S. extradition requests to Bulgaria will not be denied based on Bulgaria's ability to assert criminal jurisdiction for the same offense for which extradition has been requested.

Article 6 provides that extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.

Article 7, which is taken from Article 13 of the U.S.-EU Extradition Agreement, concerns capital punishment. It provides that, when an offense for which extradition is sought is punishable by death under the laws in the Requesting State but not under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty, if imposed, shall not be carried out. If the Requesting State accepts extradition subject to such a condition, it must comply with the condition.

Article 8 establishes extradition procedures and describes the documents required to support a request for extradition. Article 8(1), which is taken from Article 5(1) of the U.S.-EU Extradition Agreement, provides that all requests for extradition must be submitted through the diplomatic channel, which shall include transmission through the channel specified in Article 11(4) of the Treaty. Article 8(2) specifies the documents, information, and legal texts that shall support all extradition requests. Article 8(3) provides that a request for the extradition of a person who is charged with an offense must also be supported by such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought. Article 8(4) sets forth the items, in addition to those in paragraph 2, that must accompany a request for the extradition relating to a person who has been found guilty or been convicted of the offense for which extra-

EXT-SIMEONOV-00013

IX

dition is sought. It further requires that a request for extradition of a person who has been convicted in absentia must also be supported by such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought, as well as information regarding the circumstances under which the person was absent from the proceedings. Article 8(5), which is taken from Article 8 of the U.S.-EU Extradition Agreement, authorizes the Requested State to require the Requesting State to furnish additional information to support an extradition request, if the Requested State deems it necessary to fulfill the requirements of the Treaty. It specifies that such information may be requested and supplied directly between the United States Department of Justice and the Ministry of Justice of the Republic of Bulgaria.

Article 9, which is taken from Article 5(2) of the U.S.-EU Extradition Agreement, concerns admissibility of documents. It provides that documents bearing the certificate or seal of either the Ministry or Department of Justice or the foreign affairs Ministry or Department of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification.

Article 10 provides that all documents submitted under the Treaty by the Requesting State shall be translated into the language of the Requested State, unless otherwise agreed.

Article 11 sets forth procedures and describes the information that is required for the provisional arrest and detention of the person sought pending presentation of the formal extradition request and supporting documents. Article 11(1) provides for provisional arrest and sets forth procedures for transmission of a request for provisional arrest. Article 11(2) specifies the information that must accompany an application for provisional arrest. Article 11(3) requires the Requested State to notify the Requesting State of the disposition of the provisional arrest request and the reasons for any inability to proceed with the request.

Article 11(4) provides that, if the Requested State has not received the request for extradition and supporting documents within sixty days of the date of provisional arrest, the person may be discharged. Consistent with Article 7 of the U.S.-EU Extradition Agreement, Article 11(4) provides an alternative channel for receipt of extradition requests applicable with respect to persons who have been provisionally arrested, namely, through transmission of the request to the Embassy of the Requested State in the Requesting State. Article 11(5) provides that the discharge of a person from custody pursuant to Article 11(4) does not prejudice the person's subsequent re-arrest and extradition if the extradition request and supporting documents are delivered at a later date.

Article 12 specifies the procedures governing a decision on the extradition request and the surrender of the person sought. It requires the Requested State to promptly notify the Requesting State of its decision regarding a request. If the request is denied in whole or in part, the Requested State must provide an explanation of the reasons for the denial and, upon request, copies of pertinent judicial decisions. If extradition is granted, the States shall agree on the time and place for the surrender of the person sought. If the person sought is not removed from the territory of the Requested

x

State within the time period prescribed by the law of that State, the person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Article 13 addresses temporary and deferred surrender. Under Article 13(1), if a person whose extradition is sought is being proceeded against or is serving a sentence in the Requested State, the Requested State may defer extradition proceedings until the proceedings have been concluded or the sentence has been served in the Requested State. Alternatively, the Requested State may conduct the extradition proceedings and, if extradition is authorized, may choose to temporarily surrender the person to the Requesting State for the purpose of prosecution.

Consistent with Article 9 of the U.S.-EU Extradition Agreement, Article 13(2) provides that the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States. Time spent in custody in the Requesting State pending prosecution there may be deducted from the time to be served in the Requested State. The return of the person to the Requested State shall not require further extradition procedures.

Article 14, which is taken from Article 10 of the U.S.-EU Extradition Agreement, governs the situation in which the Requested State receives requests for the extradition or surrender of the same person from more than one State, either for the same offense or for different offenses. Under Article 14(1), in the event of requests by more than one State for the same person, the executive authority of the Requested State shall determine to which State, if any, it will surrender that person. Article 14(2) provides that, in the event that Bulgaria receives an extradition request from the United States and a request for surrender pursuant to the European Arrest Warrant for the same person, Bulgaria's competent court of law, or such other authority as Bulgaria may designate, shall determine to which State, if any, it will surrender the person.

Article 14(3) provides a non-exclusive list of factors to be considered by the Requested State in determining to which State to surrender a person who is sought by more than one State.

Article 15 provides that the Requested State may, to the extent permitted under its law, seize and surrender to the Requesting State all items, including articles, documents, evidence, and proceeds, that are connected with the offense in respect of which extradition is granted. Such items may be surrendered even if the extradition cannot be carried out due to the death, disappearance, or escape of the person sought. The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State. The rights of third parties in such items are to be respected in accordance with the laws of the Requested State.

Article 16 sets forth the Rule of Specialty, which, subject to spe-
cific exceptions set forth in paragraph 3, prohibits a person extra-
dited under the Treaty from being detained, tried, or punished in
the Requesting State except for:

(a) any offense for which extradition was granted, or a differently
denominated offense based on the same facts as the offense for
which extradition was granted, provided such offense is extra-
ditable, or is a lesser included offense;

(b) any offense committed after the extradition of the person; or

(c) any offense for which the competent authority of the Re-
quested State consents to the extradition of the person's detention, trial, or punish-
ment.

Article 16(2) provides that a person extradited under the Treaty
may not be the subject of onward extradition or surrender for any
offense committed prior to the extradition to the Requesting State
unless the Requested State consents. This provision would preclude
Bulgaria from transferring a fugitive surrendered to it by the
United States to a third country or international tribunal without
the consent of the United States.

Article 16(3) sets forth exceptions to the rule of specialty. It pro-
vides that the restrictions set forth under paragraphs 1 and 2 shall
not prevent the detention, trial, or punishment of an extradited
person, or the extradition of a person to a third State, if the extra-
dited person either leaves the territory of the Requesting State
after extradition and voluntarily returns to it or fails to leave the
territory of the Requesting State within twenty-five days of being
free to do so.

Consistent with Article 11 of the U.S.-EU Extradition Agree-
ment, Article 17 provides for simplified procedures in situations
where the person sought waives extradition or consents to being
surrendered. The rule of specialty protections do not apply if a per-
son waives extradition. If a person consents to surrender, the con-
sent of the person sought may include agreement to waiver of pro-
tection of the rule of specialty.

Article 18, which is taken from Article 12 of the U.S.-EU Extra-
dition Agreement, governs the transit through the territory of one
State of a person surrendered to the other State by a third country,
or to a third country by the other State.

Article 19 contains provisions regarding representation and the
expenses associated with extradition. Specifically, the Requested
State is required to advise, assist, appear in court on behalf of, and
represent the interests of the Requesting State in any proceedings
arising out of a request for extradition. Article 19(2) establishes
that the Requested State bears all expenses incurred in that State
in connection with the extradition proceedings, except that the Re-
questing State pays expenses related to the translation of extra-
dition documents and the transportation of the person surrendered.
Article 19(3) specifies that neither State shall make any pecuniary
claim against the other arising out of the arrest, detention, exam-
ination, or surrender of persons under the Treaty.

Article 20(1) provides that the U.S. Department of Justice and
the Bulgarian Ministry of Justice may consult in connection with
the processing of individual cases and in furtherance of efficient
implementation of the Treaty.

XII

Article 20(2), which is taken from Article 14 of the U.S.-EU Extradition Agreement, provides for consultation between the Parties when the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition, in order to determine the extent to which the information can be protected by the Requested State in the event of submission.

Article 21 makes the Treaty applicable to offenses committed both before and after the date it enters into force.

Article 22 contains final clauses addressing the Treaty's ratification and entry into force. It provides that the Treaty is subject to ratification and that the Treaty shall enter into force upon the date of the latter of the diplomatic notes by which the Parties notify each other that their internal legal requirements for the entering into force of the Treaty have been completed. Article 22(3) provides that, upon entry into force of the Treaty, the Treaty shall supersede the Treaty of Extradition between the United States of America and Bulgaria, signed at Sofia on March 19, 1924, as well as the Supplementary Extradition Treaty, signed at Washington on June 8, 1934, and shall apply to all pending requests made under those prior treaties.

Under Article 23, either State may terminate the Treaty with six months' written notice to the other State through the diplomatic channel.

The Department of Justice joins the Department of State in urging approval of this Treaty by the Senate at the earliest possible date.

AGREEMENT ON CERTAIN ASPECTS OF MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF BULGARIA

OVERVIEW

The Agreement on Certain Aspects of Mutual Legal Assistance in Criminal Matters between the Government of the United States of America and the Government of the Republic of Bulgaria (the "MLA Agreement" or the "Agreement") serves to implement, as between the United States and Bulgaria, the provisions of the 2003 Agreement on Mutual Legal Assistance between the United States of America and the European Union (the "U.S.-EU Mutual Legal Assistance Agreement"). Because the United States and Bulgaria do not have a bilateral mutual legal assistance treaty in force between them, the MLA Agreement is a partial treaty governing only those issues regulated by the U.S.-EU Mutual Legal Assistance Agreement. This approach is consistent to the one taken with the other EU member states (Denmark, Finland, Malta, Portugal, Slovak Republic, and Slovenia) with which the United States did not have an existing bilateral mutual legal assistance treaty.

The following is a description of the provisions of the MLA Agreement and the accompanying Annex.

*The MLA Agreement*

Paragraph 1 of the Agreement specifies the articles of the U.S.-EU Mutual Legal Assistance Agreement applicable between the

XIII

United States and Bulgaria. These provisions are set forth in detail in the Annex to the MLA Agreement.

Paragraph 2 states that the Agreement shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Paragraph 3 provides that the Annex to the Agreement reflects the provisions of the U.S.-EU Mutual Legal Assistance Agreement that shall apply between the United States and Bulgaria.

In accordance with Article 12 of the U.S.-EU Mutual Legal Assistance Agreement, paragraphs 4 and 5 make the Agreement applicable to offenses committed both before and after the date it enters into force. In accordance with Article 12(2) of the U.S.-EU Mutual Legal Assistance Agreement, Articles 3 and 4 of the Annex apply to requests pending at the time the Agreement enters into force.

Paragraph 6 sets forth provisions on the entry into force and termination of the Agreement. The Agreement will enter into force after an exchange of instruments between the United States and Bulgaria indicating that they have completed their internal procedures for entry into force and on the date of entry into force of the U.S.-EU Mutual Legal Assistance Agreement. Should the U.S.-EU Mutual Legal Assistance Agreement be terminated, the Agreement will also be terminated, although the Parties may nevertheless agree to continue to apply some or all of its provisions.

*The Annex to the MLA Agreement*

Article 1 of the Annex incorporates Article 4 of the U.S.-EU Mutual Legal Assistance Agreement ("Identification of bank information").

Article 1(1) requires the Requested State, upon receiving a request, to promptly ascertain if banks located in its territory possess information on whether a natural or legal person suspected of or charged with a criminal offense as designated pursuant to Article 1( 4), holds a bank account or accounts. Subsection (b) permits, but does not obligate, the Requested State to ascertain whether bank information exists pertaining to convicted persons, or whether there is information in the possession of non-bank financial institutions, or financial transactions other than those related to accounts.

Article 1(2) requires a request for this form of cooperation to include, first, the identity of the natural or legal person relevant to locating such accounts or transactions; second, sufficient information to enable the competent authority of the Requested State to reasonably suspect that such person engaged in a criminal offense and that banks or non-bank financial institutions in the Requested State may have the information requested and to conclude that the information sought relates to the criminal investigation or proceeding for which assistance is sought; and, third, as much information as possible concerning which banks or other institutions may have the information, in order to reduce the breadth of the inquiry.

Article 1(3) designates the U.S. channel of communication for requests for assistance under this article as the U.S. attache responsible for Bulgaria of the Drug Enforcement Administration, the Bureau of Immigration and Customs Enforcement, and the Federal

XIV

Bureau of Investigation (depending on the nature of the investigation or proceeding giving rise to the request). For Bulgaria, the designated channel is the Supreme Cassation Prosecutors Office during pretrial and the Ministry of Justice during the trial. Article 1(3) also allows the United States and the European Union to modify these designations by exchange of diplomatic notes after the entry into force of the Agreement.

Article 1(4) provides that the United States and Bulgaria will provide assistance under this article with respect to money laundering and terrorist activity punishable under the laws of both states, and with respect to such other criminal activity as to which they may notify each other. U.S. negotiators verified that under Bulgarian law, assistance will be available for a wide range of conduct associated with terrorism (which includes the conduct criminalized in international counter-terrorism conventions to which they are party) and money laundering with respect to an extremely broad range of predicate offenses.

Article 1(5) establishes that assistance may not be refused under Article 1 on the grounds of bank secrecy.

Article 1(6) provides that the Requested State shall respond to a request for production of the records concerning the accounts or transactions identified pursuant to this article in accordance with its domestic law.

Article 2 of the Annex incorporates Article 5 of the U.S.-EU Mutual Legal Assistance Agreement ("Joint investigative teams").

Article 2(1) provides that joint investigative teams may be established and operated in the respective territories of the United States and Bulgaria, where the Parties agree to do so.

Under Article 2(2), the manner of the team's operation shall be agreed between the competent authorities, as determined by the respective States concerned.

Article 2(3) describes channels of communication so as to facilitate direct communication between law enforcement authorities with respect to cases arising under Article 2. The paragraph provides that the competent authorities determined by the respective States concerned shall communicate directly for purposes of establishing and operating such teams, except where the complexity, scope or other circumstances involved are deemed to require more central coordination, in which case the States concerned may agree upon other channels of communication. This approach facilitates speed, efficiency and clarity by providing for direct communications in most cases among the affected law enforcement components, rather than through a mutual legal assistance request transmitted through a central authority, as would otherwise generally take place.

Article 2(4) states that, where the joint investigative team needs investigative measures to be taken in one of the States involved in the team, a member of the team of that State may request its own competent authorities to take those measures without the other State having to submit a mutual legal assistance request. The legal standard for obtaining the measure is the applicable domestic standard. Thus, where an investigative measure is to be carried out in the United States, for example, a U.S. team member could do so by invoking existing domestic investigative authority, and would

xv

share resulting information or evidence seized pursuant to such an action with the foreign authorities. A formal mutual legal assistance request would not be required. In a case in which there is no domestic U.S. jurisdiction and consequently a compulsory measure cannot be carried out based on domestic authority, the provisions of 28 U.S.C. Section 1782 may furnish a separate legal basis for carrying out such a measure.

Article 3 of the Annex incorporates Article 6 of the U.S.-EU Mutual Legal Assistance Agreement ("Video conferencing").

Article 3(1) provides that the use of video transmission technology shall be available between the United States and Bulgaria for taking testimony in a proceeding for which mutual legal assistance is available. To the extent that procedures for video conferencing are not set forth in Article 3, the law of the Requested State governs the procedures.

Article 3(2) provides that the costs associated with establishing and servicing the video transmission will be borne by the Requesting State, unless otherwise agreed. Other related costs will be borne as agreed upon by the United States and Bulgaria.

Article 3(3) provides for a consultation mechanism in order to facilitate legal, technical or logistical issues that may arise in the execution of a particular request.

Article 3(4) provides that the making of intentionally false statements or other witness or expert misconduct shall be punishable in the Requested State in the same manner as if such conduct had been committed in the course of a domestic proceeding. This is already the case where the United States has been requested to facilitate the taking of video testimony from a witness or expert located in the United States on behalf of a foreign State, since the proceeding to execute the request is a U.S. proceeding and therefore penalties under U.S. law for perjury, obstruction of justice or contempt of court are applicable.

Article 3(5) specifies that the availability of video transmission technology for purposes of facilitating the taking of testimony does not mean that other means of obtaining testimony are no longer available.

Article 3(6) makes clear that the Requested State may also permit the use of video conferencing technology for purposes other than providing testimony, including for purposes of identification of persons or objects, and taking of investigative statements (to the extent these are not considered to be testimony under the law of the Requesting State).

Article 4 of the Annex incorporates Article 7 of the U.S.-EU Mutual Legal Assistance Agreement ("Expedited transmission of requests"). Article 4 provides that requests for mutual legal assistance, and communications related thereto, may be made by expedited means of communications, including fax or email, with formal confirmation to follow where required by the Requested State. The Requested State may respond to the request by any such expedited means of communication.

Article 5 of the Annex incorporates Article 8 of the U.S.-EU Mutual Legal Assistance Agreement ("Mutual legal assistance to administrative authorities"). Article 5 provides an express legal basis for the provision of assistance to an administrative authority inves-

XVI

tigating conduct with a view to criminal prosecution or referral to criminal investigation or prosecution authorities, pursuant to its specific administrative or regulatory authority to undertake such investigation. If the administrative authority anticipates that no prosecution or referral will take place, assistance is not available. Article 5(2) provides that requests for assistance under Article 5 shall be transmitted between the U.S. Department of Justice and the Bulgarian Ministry of Justice or such other authorities as may be agreed upon by the U.S. Department of Justice and Bulgarian Ministry of Justice.

Article 6 of the Annex incorporates Article 9 of the U.S.-EU Mutual Legal Assistance Agreement ("Limitations on use to protect personal and other data").

Article 6(1) permits the Requesting State to use evidence or information it has obtained from the Requested State for its criminal investigations and proceedings, for preventing an immediate and serious threat to its public security, for non-criminal judicial or administrative proceedings directly related to its criminal investigations or proceedings, for non-criminal judicial or administrative proceedings for which assistance was provided under Article 5 of the Annex, and for any other purpose if the information or evidence was made public within the framework of the proceedings for which it was transmitted or pursuant to the above permissible uses. Other uses of the evidence or information require the prior consent of the Requested State.

Article 6(2)(a) specifies that the Article does not preclude the Requested State from imposing additional conditions where the particular request for assistance could not be granted in the absence of such conditions. Where such additional conditions are imposed, the Requested State may require the Requesting State to give information on the use made of the evidence or information.

Article 6(2)(b) provides that generic restrictions with respect to the legal standards of the Requesting State for processing personal data may not be imposed by the Requested State as a condition under paragraph 2( a) to providing evidence or information. This provision is further elaborated upon in the explanatory note to the U.S.-EU Mutual Legal Assistance Agreement (regarding Article 9(2)(b) of that Agreement), which specifies that the fact that the Requesting and Requested States have different systems of protecting the privacy of data does not give rise to a ground for refusal of assistance and may not as such give rise to additional conditions under Article 6(2)(a). Such refusal of assistance could only arise in exceptional cases in which, upon balancing the important interests involved in the particular case, furnishing the specific data sought by the Requesting State would raise difficulties so fundamental as to be considered by the Requested State to fall within the "essential interests" grounds for refusal contained in Article 8.

Article 6(3) provides that where, following disclosure to the Requesting State, the Requested State becomes aware of circumstances that may cause it to seek additional conditions in a particular case, it may consult with the Requesting State to determine the extent to which the evidence or information can be protected.

XVII

Article 7 of the Annex incorporates Article 10 of the U.S.-EU Mutual Legal Assistance Agreement ("Requesting State's request for confidentiality"). Article 7 requires the Requested State, if asked, to use its best efforts to keep confidential a request and its contents, and to inform the Requesting State if the request cannot be executed without breaching confidentiality.

Article 8 of the Annex incorporates Article 13 of the U.S.-EU Mutual Legal Assistance Agreement ("Non-derogation"). Article 8 makes clear that the provisions of the Annex do not preclude the assertion of a ground for refusal of assistance available to the Requested States pursuant to its applicable legal principles, including where execution of the request would prejudice its sovereignty, security, public order or other essential interests, except where such ground for refusal is precluded by Article 1(5) (bank secrecy) or 6(2)(b) (generic restrictions relating to personal data) of the Annex.

The Department of Justice joins the Department of State in urging approval of this Agreement by the Senate at the earliest possible date.

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 09-521

# EXTRADITION

Treaty Between the

**UNITED STATES OF AMERICA**

**and BULGARIA**

Signed at Sofia September 19, 2007

*with*

Exchange of Rectifying Notes



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

EXT-SIMEONOV-00024

# BULGARIA

## Extradition

*Treaty signed at Sofia September 19, 2007;*
*Transmitted by the President of the United States of America*
    *to the Senate January 22, 2008 (Treaty Doc. 110-12,*
    *110th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
    *July 29, 2008 (Senate Executive Report No. 110-12,*
    *110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
    *September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Notes at Sofia May 10, 2008 and*
    *May 21, 2009;*
*Entered into force May 21, 2009.*
*With exchange of rectifying notes.*

EXTRADITION TREATY

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNMENT OF THE REPUBLIC OF BULGARIA

## TABLE OF CONTENTS

Article 1 ................................................................. Obligation to Extradite

Article 2 ................................................................. Extraditable Offenses

Article 3 ................................................................. Nationality

Article 4 ................................................................. Political and Military Offenses

Article 5 ................................................................. Prior Prosecution

Article 6 ................................................................. Lapse of Time

Article 7 ................................................................. Capital Punishment

Article 8 ................................................................. Extradition Procedures and Required Documents

Article 9 ................................................................. Admissibility of Documents

Article 10 ............................................................... Translation

Article 11 ............................................................... Provisional Arrest

Article 12 ............................................................... Decision and Surrender

Article 13 ............................................................... Deferral of Extradition Proceedings or Temporary and Deferred Surrender

Article 14 ............................................................... Requests for Extradition or Surrender Made by Several States

Article 15 ............................................................... Seizure and Surrender of Property

Article 16 ............................................................... Rule of Specialty

Article 17 ............................................................... Simplified Procedures

Article 18 ............................................................................ Transit

Article 19 ............................................................................ Representation and Expenses

Article 20 ............................................................................ Consultation

Article 21 ............................................................................ Application

Article 22 ............................................................................ Ratification and Entry into Force

Article 23 ................................................................ Termination

The Government of the United States of America and the Government of the Republic of Bulgaria (hereinafter referred to as "the Parties"),

Recalling the Treaty of Extradition between the United States of America and Bulgaria, signed at Sofia on March 19, 1924, and the Supplementary Extradition Treaty, signed at Washington on June 8, 1934;

Noting that both the Government of the United States of America and the Government of the Republic of Bulgaria currently apply the terms of these Treaties;

Mindful of obligations set forth in the Agreement on Extradition between the United States of America and the European Union signed at Washington on June 25, 2003;

Having due regard for rights of individuals and the rule of law; and

Desiring to provide for more effective cooperation between the Parties in the fight against crime, and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

Article 1

Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by authorities in the Requesting State for prosecution or for imposition or execution of a sentence for an extraditable offense.

Article 2

Extraditable Offenses

1.      An offense shall be an extraditable offense if it is punishable under the laws in both States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

2.      An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of any offense described in paragraph 1 of this Article.

3.      For the purposes of this Article, an offense shall be considered an extraditable offense:

(a)     regardless of whether the laws in the Requesting and Requested States place the acts or omissions constituting the offense within the same category of offenses or describe the offense by the same terminology;

(b)     regardless of whether the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States Federal court; or

      (c)     regardless of whether, in criminal cases relating to taxes, customs duties, currency control and the import or export of commodities, the laws of the Requesting and Requested States provide for the same kinds of taxes, customs duties, or controls on currency or on the import or export of the same kinds of commodities.

4.     If the offense has been committed outside the territory of the Requesting State, extradition shall be granted, subject to the other applicable requirements for extradition, if the laws of the Requested State provide for the punishment of an offense committed outside its territory in similar circumstances. If the laws of the Requested State do not provide for the punishment of an offense committed outside its territory in similar circumstances, the executive authority of the Requested State, at its discretion, may grant extradition provided that all other applicable requirements for extradition are met.

5.     If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

6.     Where the request is for enforcement of the sentence of a person convicted of an extraditable offense, the deprivation of liberty remaining to be served must be at least four months.

Article 3

Nationality

1.     A Party shall not refuse extradition based solely on the nationality of the person sought with respect to offenses falling within the following descriptions:

     (1)    participation in a criminal organization;
     (2)    terrorism;
     (3)    trafficking in persons;
     (4)    sexual assault, molestation, and exploitation of children, and child pornography;

(5)   illicit trafficking in narcotic drugs and psychotropic substances;

(6)   illicit trafficking in weapons, munitions and explosives;

(7)   corruption;

(8)   fraud;

(9)   laundering of proceeds of crime;

(10)  counterfeiting currency;

(11)  computer-related crime;

(12)  environmental crime, including illicit trafficking in endangered animal species and in endangered plant species and varieties;

(13)  facilitation of unauthorized immigration, entry, and residence;

(14)  murder, grievous bodily injury;

(15)  illicit trade in human organs and tissue;

(16)  kidnapping, illegal restraint and hostage-taking;

(17)  organized or armed robbery;

(18)  illicit trafficking in cultural goods, including antiques and works of art;

(19)  racketeering and extortion;

(20)  counterfeiting and piracy of products including intellectual property;

(21)  forgery of administrative documents and trafficking therein;

(22)  forgery of means of payment;

(23)  illicit trafficking in hormonal substances and other growth promoters;

(24)  illicit trafficking in nuclear or radioactive materials;

(25)  trafficking in stolen vehicles;

(26)  rape and sexual assault;

(27)  arson;

(28)  unlawful seizure of aircrafts or ships;

(29)  sabotage; and

(30)  conspiracy or attempt to commit any of the offenses listed in this Article.

2.     In addition, with respect to offenses not described in paragraph 1 of this Article, the executive authority of the Requested State shall have the power to extradite its nationals if it decides to do so.

3.     If extradition is denied solely on the basis of the nationality of the person sought pursuant to paragraph 2 of this Article, the Requested State shall, at the request of the Requesting State, submit the case to its competent authorities for prosecution.

4.     The Parties may expand the offenses designated in this Article by mutual agreement and notification made through the diplomatic channel.

Article 4

Political and Military Offenses

1.    Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.    For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)    an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b)    murder, manslaughter, malicious wounding, inflicting grievous bodily harm, assault with intent to cause serious physical injury, and serious sexual assault;

(c)    an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(d)    placing, using, threatening the use of, or possessing an explosive, incendiary or destructive device capable of endangering life, of causing substantial bodily harm, or of causing substantial property damage; and

(e)    a conspiracy or attempt to commit any of the foregoing offenses, or participation in the commission of such offenses.

3.    Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the Executive Authority of the Requested State determines that the request was politically motivated.

4.       The Executive Authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law.

## Article 5
### Prior Prosecution

1.       Extradition shall not be granted when the person sought has been convicted or discharged from proceedings with final and binding effect by the competent authorities in the Requested State for the offense for which extradition is requested.  In applying this Article, an acquittal or discharge for lack of jurisdiction shall not constitute an obstacle to extradition.

2.       Requests for extradition shall not be refused solely on the basis of the existence of  criminal jurisdiction in the Requested State.   Provisions of the laws of the Parties, including laws on extradition and prior prosecution, will be applied to give full force and effect to the obligations of Articles 1 and 3 of this Treaty.

## Article 6
### Lapse of Time

Extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State.  Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.

## Article 7
### Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the

Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied.

Article 8

Extradition Procedures and Required Documents

1.      Requests for extradition and supporting documents shall be transmitted through the diplomatic channel, which shall include transmission as provided for in Article 11(4).

2.      All requests for extradition shall be supported by:

     (a)     documents, statements, or other types of information that describe the identity, nationality, and probable location of the person sought;

     (b)     information describing the facts of the offense and a brief summary of the procedural history of the case;

     (c)     the text of the law or laws describing the essential elements of the offense for which extradition is requested and the applicable penalty or penalties;

     (d)     the text of the law or laws describing any time limit on the prosecution or execution of a penalty and a statement describing the application of such law or laws to the offense for which extradition is sought; and

     (e)     the documents, statements, or other types of information specified in either paragraph 3 or paragraph 4 of this Article, as applicable.

3.     In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall also be supported by:

     (a)    a copy of the warrant or order of arrest or detention, if any, issued by a judge, court, or other competent authority;

     (b)    a copy of the charging document, if any; and

     (c)    such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.

4.     In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted or found guilty of the offense for which extradition is sought shall also be supported by:

     (a)    a copy of the judgment of conviction, or, if a copy is not available, a statement by a judicial authority that the person has been convicted or found guilty;

     (b)    information establishing that the person sought is the person to whom the finding of guilt refers;

     (c)    a copy of the sentence imposed and a statement establishing to what extent the sentence has been carried out, if the person sought has been sentenced;

     (d)    in the case of a person who has been convicted or found guilty in absentia, the information required by paragraph 3(c) of this Article; and

     (e)    in the case of a person who has been convicted or found guilty in absentia,

information regarding the circumstances under which the person was absent from the proceedings.

5.    (a)    The Requested State may require the Requesting State to furnish additional information within such reasonable length of time as it specifies, if it considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty.

(b)    Such supplementary information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of the Republic of Bulgaria.

Article 9

Admissibility of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. Ministry of Justice shall, for the United States of America, mean the United States Department of Justice; and, for the Republic of Bulgaria, the Ministry of Justice of the Republic of Bulgaria.

Article 10

Translation

The request for extradition and all documents submitted by the Requesting State in support of the request shall be accompanied by a translation into the language of the Requested State, unless otherwise agreed.

## Article 11
### Provisional Arrest

1.    In case of urgency, the Requesting State may request the provisional arrest of the person sought pending presentation of the extradition request and supporting documents. A request for provisional arrest may be transmitted directly between the United States Department of Justice and the Supreme Cassation Prosecutors Office of the Republic of Bulgaria. The facilities of the International Criminal Police Organization (Interpol) also may be used to transmit such a request.

2.    The application for provisional arrest shall contain:

    (a)    a description of the person sought;

    (b)    the location of the person sought, if known;

    (c)    a brief statement of the facts of the case, including, if possible, the time and location of the offense;

    (d)    a description of the law(s) violated;

    (e)    a statement of the existence of a warrant or order of arrest or detention or a finding of guilt or judgment of conviction against the person sought; and

    (f)    a statement that the extradition request and supporting documents will follow within the time specified in this Treaty.

3.    The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4.    A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the Executive Authority of the Requested State has not received the extradition request and supporting documents required in Article 8. For purposes of this paragraph, receipt of the extradition request and supporting documents by the Embassy of the Requested State located in the Requesting State shall constitute receipt by the Executive Authority of the Requested State.

5.     The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 12

Decision and Surrender

1.     The Requested State shall promptly notify the Requesting State of its decision on the request for extradition.

2.     If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial.  The Requested State shall provide copies of pertinent judicial decisions upon request.

3.     If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.  The facilities of the International Criminal Police Organization (Interpol) may be used for this purpose.

4.     If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Article 13

Deferral of Extradition Proceedings or Temporary and Deferred Surrender

1.     When the person whose extradition is sought is being proceeded against or is serving a sentence in the Requested State, that State may:

(a)  defer the extradition proceedings against the person sought until the

proceedings have been concluded or until the sentence has been served; or

(b)  conduct the extradition proceedings, and if extradition is authorized, either

(i)  postpone the surrender of the person sought until the proceedings have been concluded or until the sentence has been served; or

(ii)  temporarily surrender the person to the Requesting State for the purpose of prosecution.

2.  A person temporarily surrendered shall be kept in the custody of the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with any conditions that may be determined by agreement between the Parties. The time spent in custody in the territory of the Requesting State pending prosecution in that State may be deducted from the time remaining to be served in the Requested State. The return of the person to the Requested State shall not require any further extradition request or proceedings.

Article 14

Requests for Extradition or Surrender Made by Several States

1.  If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the Executive Authority of the Requested State shall determine to which State, if any, it will surrender the person. For purposes of this paragraph, the executive authority for the Republic of Bulgaria shall be the Ministry of Justice.

2.  If the Republic of Bulgaria receives an extradition request from the United States of

America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, the competent court of law of the Republic of Bulgaria, or such other authority as the Republic of Bulgaria may subsequently designate, shall determine to which country, if any, it will surrender the person.

3.      In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all relevant factors, including, but not limited to, the following:

        (a)      whether the requests were made pursuant to a treaty;

        (b)      the places where each of the offenses was committed;

        (c)      the respective interests of the Requesting States;

        (d)      the seriousness of the offenses;

        (e)      the nationality of the victim;

        (f)      the possibility of any subsequent extradition between the Requesting States; and

        (g)      the chronological order in which the requests were received from the Requesting States.

Article 15

Seizure and Surrender of Property

1.      To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items, including articles, documents, evidence, and proceeds, that are connected with the offense in respect of which extradition is granted. The items mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought and may be surrendered prior to the extradition.

2.      The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as

soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

3.     The rights of third parties in such items shall be duly respected in accordance with the laws of the Requested State.

Article 16

Rule of Specialty

1.     A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)     any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense for which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)     any offense committed after the extradition of the person; or

(c)     any offense for which, the competent authority of the Requested State consents to the person's detention, trial, or punishment; in the case of the United States, its competent authority shall be its Executive Authority. For the purpose of this subparagraph:

(i)     the Requested State may require the submission of the documentation called for in Article 8; and

(ii)     the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2.      A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3.      Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of that person to a third State, if:

      (a)      that person leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

      (b)      that person does not leave the territory of the Requesting State within 25 days of the day on which that person is free to leave.

Article 17

Simplified Procedures

1.      If the person waives extradition, the competent judicial authority before whom such waiver is made may direct the transfer of the person to the requesting Party without further proceedings.  The specialty provisions in Article 16 shall not apply if the person sought waives extradition pursuant to this provision.

2.      If the person sought consents to be surrendered to the Requesting State, the Requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings.  The consent of the person sought may include agreement to waiver of the specialty provisions in Article 16.

Article 18

Transit

1.      The United States of America may authorize transportation through its territory of a person surrendered to the Republic of Bulgaria by a third country, or by the Republic of Bulgaria to a third country. The Republic of Bulgaria may authorize transportation through its territory of a person surrendered to the United States of America by a third country, or by the United States of America to a third country.

2.      A request for transit shall be made through the diplomatic channel or directly between the United States Department of Justice and the Supreme Cassation Prosecutors Office of the Republic of Bulgaria. The facilities of Interpol may also be used to transmit such a request. The request shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit shall be detained in custody during the period of transit.

3.      Authorization is not required when air transportation is used and no landing is scheduled on the territory of the transit country. If an unscheduled landing does occur, the country in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 2. All measures necessary to prevent the person from absconding shall be taken until transit is effected, as long as the request for transit is received within 96 hours of the unscheduled landing.

Article 19

Representation and Expenses

1.      The Requested State shall advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition.

2.      The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3.      Neither State shall make any pecuniary claim against the other State arising out of

the arrest, detention, examination, or surrender of persons under this Treaty.

Article 20

Consultation

1.      The United States Department of Justice and the Ministry of Justice of Bulgaria may consult with each other directly or through the facilities of Interpol in connection with the

processing of individual cases and in furtherance of efficient implementation of this Treaty.

2.      Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the requested State to determine the extent to which the information can be protected by the Requested State.  If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

Article 21

Application

This Treaty shall apply to offenses committed before as well as after the date it enters into force.

Article 22

Ratification and Entry into Force

1.      This Treaty shall be subject to ratification.

2.      This Treaty shall enter into force on the date of the latter of the diplomatic notes by which the Parties notify each other that their internal legal requirements for the entering into force of the Treaty have been completed.

3.      Upon the entry into force of this Treaty, this Treaty shall supersede the Treaty of Extradition between the United States of America and the Republic of Bulgaria signed at Sofia on March 19, 1924, and the Supplementary Extradition Treaty signed at Washington on June 8, 1934 (together, the "prior Treaties") and apply to all pending requests made under the prior Treaties.

Article 23

Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel and the termination shall be effective six months after the date of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at Sofia, in duplicate, this 19 day of September, 2007, in the English and Bulgarian languages, both texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE REPUBLIC OF BULGARIA:

ANNEX

**Article 1:**
**Identification of bank information**

1. (a)  Upon request of the Requesting State, the Requested State shall, in accordance with the terms of this Article, promptly ascertain if the banks located in its territory possess information on whether an identified natural or legal person suspected of or charged with a criminal offense is the holder of a bank account or accounts. The Requested State shall promptly communicate the results of its enquiries to the Requesting State.

(b)  The actions described in subparagraph (a) may also be taken for the purpose of identifying:

    (i)  information regarding natural or legal persons convicted of or otherwise involved in a criminal offense;

    (ii)  information in the possession of non-bank financial institutions; or

    (iii)  financial transactions unrelated to accounts.

2.  A request for information described in paragraph 1 of this Article shall include:

(a)  the identity of the natural or legal person relevant to locating such accounts or transactions;

(b)  sufficient information to enable the competent authority of the Requested State to:

    (i)  reasonably suspect that the natural or legal person concerned has engaged in a criminal offense and that banks or non-bank financial institutions in the territory of the Requested State may have the information requested; and

    (ii)  conclude that the information sought relates to the criminal investigation or proceeding; and

(c)  to the extent possible, information concerning which bank or non-bank financial institution may be involved, and other information the availability of which may aid in reducing the breadth of the enquiry.

3.  Unless subsequently modified by exchange of diplomatic notes between the European Union and the United States of America, requests for assistance under this Article shall be transmitted between:

(a)  for the Republic of Bulgaria, the Supreme Cassation Prosecutors Office during pretrial and the Ministry of Justice during the trial; and

(b)  for the United States of America, the attaché responsible for Bulgaria of the:

    (i) U.S. Department of Justice, Drug Enforcement Administration, with respect to matters within its jurisdiction;

3

       (ii) U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement, with respect to matters within its jurisdiction;

       (iii) U.S. Department of Justice, Federal Bureau of Investigation, with respect to all other matters.

4.    The United State of America and the Republic of Bulgaria shall provide assistance under this Article with respect to money laundering and terrorist activity punishable under the laws of both the Requesting and Requested States, and with respect to such other criminal activity as they may notify each other.

5.    Assistance may not be refused under this Article on grounds of bank secrecy.

6.    The Requested State shall respond to a request for production of the records concerning the accounts or transactions identified pursuant to this Article in accordance with the requirements of its domestic law.

**Article 2:**
**Joint investigative teams**

1.    Joint investigative teams may be established and operated in the respective territories of the United States of America and the Republic of Bulgaria for the purpose of facilitating criminal investigations or prosecutions involving the United States of America and one or more Member States of the European Union where deemed appropriate by the United States of America and the Republic of Bulgaria.

2.    The procedures under which the team is to operate, such as its composition, duration, location, organization, functions, purpose, and terms of participation of team members of a State in investigative activities taking place in another State's territory shall be as agreed between the competent authorities responsible for the investigation or prosecution of criminal offenses, as determined by the respective States concerned.

3.    The competent authorities determined by the respective States concerned shall communicate directly for the purposes of the establishment and operation of such team except that where the exceptional complexity, broad scope, or other circumstances involved are deemed to require more central coordination as to some or all aspects, the States may agree upon other appropriate channels of communications to that end.

4.    Where the joint investigative team needs investigative measures to be taken in one of the States setting up the team, a member of the team of that State may request its own competent authorities to take those measures without the other State(s) having to submit a request for mutual legal assistance. The required legal standard for obtaining the measure in that State shall be the standard applicable to its domestic investigative activities.

4

**Article 3:**
**Video conferencing**

1.  The use of video transmission technology shall be available between the United States of America and the Republic of Bulgaria for taking testimony in a proceeding for which mutual legal assistance is available of a witness or expert located in the Requested State. To the extent not specifically set forth in this Article, the modalities governing such procedure shall be as provided for under the law of the Requested State.

2.  Unless otherwise agreed by the Requesting and Requested States, the Requesting State shall bear the costs associated with establishing and servicing the video transmission. Other costs arising in the course of providing assistance (including costs associated with travel of participants in the Requested State) shall be borne as agreed upon by the Requesting and Requested States.

3.  The Requesting and Requested States may consult in order to facilitate resolution of legal, technical or logistical issues that may arise in the execution of the request.

4.  Without prejudice to any jurisdiction under the law of the Requesting State, making an intentionally false statement or other misconduct of the witness or expert during the course of the video conference shall be punishable in the Requested State in the same manner as if it had been committed in the course of its domestic proceedings.

5.  This Article is without prejudice to the use of other means for obtaining of testimony in the Requested State available under applicable treaty or law.

6.  The Requested State may permit the use of video conferencing technology for purposes other than those described in paragraph 1 of this Article, including for purposes of identification of persons or objects, or taking of investigative statements.

**Article 4:**
**Expedited transmission of requests**

Requests for mutual legal assistance, and communications related thereto, may be made by expedited means of communications, including fax or e-mail, with formal confirmation to follow where required by the Requested State. The Requested State may respond to the request by any such expedited means of communication.

**Article 5:**
**Mutual legal assistance to administrative authorities**

1.  Mutual legal assistance shall also be afforded to a national administrative authority, investigating conduct with a view to a criminal prosecution of the conduct, or referral of the conduct to criminal investigation or prosecution authorities, pursuant to its specific administrative or regulatory authority to undertake such investigation. Mutual legal assistance may also be afforded to other administrative authorities under such

5

circumstances. Assistance shall not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place.

2.    Requests for assistance under this article shall be transmitted between the United States Department of Justice and the Ministry of Justice of the Republic of Bulgaria or between such other authorities as may be agreed by the United States Department of Justice and the Ministry of Justice of the Republic of Bulgaria.

## Article 6:
### Limitations on use to protect personal and other data

1.    The Requesting State may use any evidence or information obtained from the Requested State:

(a)    for the purpose of its criminal investigations and proceedings;

(b)    for preventing an immediate and serious threat to its public security;

(c)    in its non-criminal judicial or administrative proceedings directly related to investigations or proceedings:

        (i)    set forth in subparagraph (a); or

        (ii)    for which mutual legal assistance was rendered under Article 5 of this Annex;

(d)    for any other purpose, if the information or evidence has been made public within the framework of proceedings for which they were transmitted, or in any of the situations described in subparagraphs (a), (b) and (c); and

(e)    for any other purpose, only with the prior consent of the Requested State.

2. (a)    This Article shall not prejudice the ability of the Requested State to impose additional conditions in a particular case where the particular request for assistance could not be complied with in the absence of such conditions. Where additional conditions have been imposed in accordance with this subparagraph, the Requested State may require the Requesting State to give information on the use made of the evidence or information.

(b)    Generic restrictions with respect to the legal standards of the Requesting State for processing personal data may not be imposed by the Requested State as a condition under subparagraph (a) to providing evidence or information.

3. Where, following disclosure to the Requesting State, the Requested State becomes aware of circumstances that may cause it to seek an additional condition in a particular case, the Requested State may consult with the Requesting State to determine the extent to which the evidence and information can be protected.

## ARTICLE 7:
### Requesting State's request for confidentiality

The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Requesting State. If the request cannot be executed without breaching the requested confidentiality, the central authority of the Requested

6

State shall so inform the Requesting State, which shall then determine whether the request should nevertheless be executed.

For purposes of this Article, the central authority will be:

a) for the United States the Department of Justice; and

b) for the Republic of Bulgaria the Supreme Cassation Prosecutors Office during pretrial and the Ministry of Justice during the trial.

## ARTICLE 8:
**Refusal of assistance**

Subject to Article 1(5) and 6(2)(b) of this Annex, the provisions of this Annex are without prejudice to the invocation by the requested State of grounds for refusal of assistance available pursuant to its applicable legal principles, including where execution of the request would prejudice its sovereignty, security, public order or other essential interests.

7



# МИНИСТЕРСТВО НА ПРАВОСЪДИЕТО

1040 София, ул. "Славянска" № 1, тел.: 02/92 37 546, 92 37 366, 92 37 516,
92 37 576, факс: 02/980 92 22

**99- Н-Е-15/07 от 12.03.2009 г.**

Изх. № ...............................................
(Моля, цитирайте при отговор)

На Ваш № ...............................................

**ДО
ПОСОЛСТВОТО НА
СЪЕДИНЕНИТЕ
АМЕРИКАННСКИ ЩАТИ В
СОФИЯ**

**ОТНОСНО:** Процедура по екстрадиция на осъдения български гражданин
**ЦВЕТОМИР СИМЕОНОВ СИМЕОНОВ,** роден на 08.05.1972г.

Министерството на правосъдието на Република България поднася
своите почитания на Посолството на САЩ в София и има честта
приложено да Ви изпрати молба на министъра на правосъдието за
екстрадиране на българския гражданин Цветомир Симеонов Симеонов от
САЩ за България, придружена от релевантните документи, съгласно
Договора за екстрадиция между Република България и Съединените Щати
на Америка и Конвенцията на ООН срещу транснационалната
организирана престъпност, придружени от заверен превод на английски
език.

Моля да предадете приложените молба и документи на
компетентните американски власти, като предварително благодаря за
оказаното съдействие.

Министерството на правосъдието на Република България използва
случая да поднови пред Посолството на САЩ в София своите уверения в
най-високата си към него почит.

**ДИРЕКТОР НА ДИРЕКЦИЯ
"МЕЖДУНАРОДНО ПРАВНО
СЪТРУДНИЧЕСТВО И ЕВРОПЕЙСКИ
ВЪПРОСИ":**

**БОРИСЛАВ ПЕТКОВ**

SEARCHED ____
INDEXED ____
SERIAL ED ____
FILED ____

MAR 1 2 2009

LEGAL ATTACHE
SOFIA

163E-SP-170-1



# REPUBLIC OF BULGARIA
# MINISTRY OF JUSTICE

1040 Sofia, 1, Slavyanska Str., tel.: (+359 2) 92 37 514, fax: (+359 2) 980 92 22

**99-H-E-15/07 dated 19.02.2009**
Ref. № ...........................................................
(Please quote)

Your ref. № ...............................................

**UNITED STATES
DEPARTMENT OF JUSTICE**

The Ministry of Justice of the Republic of Bulgaria presents its compliments to the Department of Justice of the United States of America and according to Art. 1, Art. 2, point 18 and Art. 11 of the Treaty on Extradition between Bulgaria and United States of America from 1924 and Art. 16 of the Convention of the United Nations against International Organized Crime, has the honour to request the extradition to the Republic of Bulgaria of the Bulgarian citizen **TSVETOMIR SIMEONOV SIMEONOV**, born on ▇▇▇▇▇▇, in order to serve punishment of 7 years and 6 months of imprisonment, imposed by Sentence No 95-"z"/19.11 2004 under Penal case No 317/2002 of the Regional Court – Kazanlak and to serve punishment of 1 year and 6 months of imprisonment, imposed by a Ruling, dated 02.03.2005, under Penal case No 14/2005 of the Regional Court - Kazanlak.

1. With a Sentence No 95-"z"/19.11 2004 under Penal case No 317/2002 of the Regional Court – Kazanlak, which came into force on 22.12.2004, the above mentioned person was found guilty and sentenced for having committed the following crimes:

* A crime, pursuant to Article 337, paragraph 1, in connection with Article 20, paragraph 2 of the Criminal Code of the Republic of Bulgaria for the fact that: on 20.12.2001, in the town of Kazanlak, with the participation of Roumen Nikolov Yorgov, Mr. Simeonov remanufactured and repaired in appropriate way weapon – gas pistols and guns – trade mark "Baikal", caliber 9x18, numbers 2791,2883,2553,2689, so that he remade them into military guns, without having a legal permission by the competent authorities, for which he was sentenced to 5 years of imprisonment.

* A crime, pursuant to Article 339, paragraph 1, connected with Article 20, paragraph 2 of the Criminal Code of the Republic of Bulgaria for the fact that: on 20.12.2001 in the town of Kazanlak, with the participation of Roumen Nikolov Yorgov, as a criminal, he gained and held fire weapon – gas pistols and guns – trade mark "Baikal", caliber 9X18, numbers 2791, 2883,2553,2689, remanufactured and repaired into military guns, as well as 5 ball cartridges for AK, 4 ball cartridges caliber 9x18 mm and 1 ball cartridge caliber 6,35 mm, without having a legal permission by the competent authorities, for which he was sentenced to 5 years of imprisonment.

Pursuant to Article 24 of the Criminal Code of the Republic of Bulgaria, the Court prolonged the sentence with 1/2, and thus the total punishment for the abovementioned two crimes became 7 years and 6 months of imprisonment.

Pursuant to Article 82, paragraph 4, in connection with paragraph 1, point 3 of the Criminal Code of the Republic of Bulgaria, the legal limitation of the above mentioned sentence, imposed to Tsvetomir Simeonov Simeonov, is 22.12.2019.

**2.** With an Agreement, dated 07.02.2000, under Penal case No 630/1998 of the Regional Court – Kazanlak, Mr. Tsvetomir Simeonov Simeonov was found guilty for the fact that: on 25.05.1998, in the town of Kazanlak, after deliberate agreement and appointment with Nikolay Stefchov Nedelchev and Daniel Petkov Kolev, intentionally and using a vehicle – a car BMW No CT 5221 CT, took another person's movable property — machine units – at the total cost of 7757,10 (seven thousand seven hundred and fifty-seven levs and ten stotinki), which represent a large amount, from their owner "M+C Hydravlic" – Kazanlak, without his consent and with the intent to unlawfully appropriate it - a crime pursuant to Article 195, paragraph 2, connected with paragraph 1, point 4 and point 5 of the Criminal Code of the Republic of Bulgaria. During the trial process all the damage were recovered and because of that Tsvetomir Simeonov Simeonov was sentenced to 1 year and six months of imprisonment for a crime pursuant to Article 197, point 4, connected with Article 195, paragraph 2, connected with paragraph 1, point 4 and point 5 of the Criminal Code of the Republic of Bulgaria and pursuant to Art. 66, paragraph 1 of the Criminal Code of the Republic of Bulgaria the serving of the imposed punishment was suspended for a trial period of 4 years.

After the Sentence, imposed by the Regional Court – Kazanlak, under Penal case No 317/2002, came into force on 22.12.2004, by a Ruling, dated 02.03.2005, under Criminal case No 14/2005 of the Regional Court – Kazanlak pursuant to Article 68, paragraph 1 of the Criminal Code of the Republic of Bulgaria, the Court ruled that Tsvetomir Simeonov Simeonov must serve separately the suspended sentence of one year and six months of imprisonment, imposed by the Regional Court- Kazanlak under the Agreement, dated 07.02.2000 and initially determined general regime. The Ruling, dated 02.03.2005, under Criminal case No 14/2005of the Regional Court – Kazanlak, entered into force on 17.03.2005.

Pursuant to Article 82, paragraph 4, in connection with paragraph 1, point 4 of the Criminal Code of the Republic of Bulgaria, the legal limitation of the serving of the punishment, imposed by the Ruling of the Regional Court – Kazanlak, is 17.09.2012.

Both Acts of the Regional Court – Kazanlak, which require declaring the person for international circulation in order to institute an inquiry, further arrest and subsequent extradition were ordained in the presence of a defense counsel, and in the absence of the convicted offender Tsvetomir Simeonov Simeonov, pursuant to article 268, paragraph 3, point 3 of the Criminal Procedure Code of the Republic of Bulgaria, as he left illegally the country.

The provision of Article 422, paragraph 1, point 6, in connection with Article 423, paragraph 5, of the Criminal Procedure Code of the Republic of Bulgaria, gives a person, sentenced in absentia, surrendered to the Republic of Bulgaria by another country, the right to file a request for reopening the criminal case against him, and the Court reopens it, no matter if the person was informed or was not informed of the inquiry against him.

The Ruling, dated 02.02.2005, under Penal case No 14/2005 of the Regional Court – Kazanlak, is a valid order for arrest /detention/, pursuant to Article 11 of the Treaty on Extradition between the Republic of Bulgaria and the United States of America from 1924. In accordance with the current legislation in the Republic of Bulgaria at the arrival of the extradited person on the territory of the Republic of Bulgaria, the same will be immediately arrested and kept in custody in the Prison – Stara Zagora for the execution of the punishment and he will receive a proper explanation of the provision of Article 422, paragraph 1, point 6.

Regarding the Sentence No 95-"z"/19.11.2004 under Penal Case No 317/2002 of the Regional Court – Kazanlak, rendered pursuant to Article 337, paragraph 1, in connection with Article 20, paragraph 2 of the Criminal Code of the Republic of Bulgaria for the crime of remanufacturing and repairing into military guns, without having a legal permission by the competent authorities; and pursuant to Article 339, paragraph 1, in connection with Article 20, paragraph 2 of the Criminal Code of the Republic of Bulgaria for the crime of gaining and holding weapons – gas pistols and guns – without having a legal permission – the Treaty on Extradition between the Republic of Bulgaria and the United States of America, signed in 1924, is not applicable, because both crimes are neither pointed in Article 2 of the Treaty, nor in Article 1 of the amendment of the Treaty, signed in 1935.

Regarding, these crimes and the rendered sentence, the Convention of the United Nations against International Organized Crime, which was signed on 13.12.2000 by the Republic of Bulgaria and came into force on 03.07.2005, and the Protocol to the Convention against Illegal Manufacture and Traffic with Weapons, Their Units, Particles, Ammunition and War Supplies, should be applied. Article 16, point 4 of Chapter "Extradition" of the Convention, says that it is the Convention itself that gives "legal basis for extradition in respect of any offense to which this article applies", according to Article 3 of the Convention.

The convicted person Tsvetomir Simeonov Simeonov is declared for international circulation through Interpol and his extradition is required because of his absconding from the judicial authorities by leaving the Republic of Bulgaria.

According to the information, provided by the database of Interpol-Sofia, the above mentioned person is located on the territory of the United States of America.

We kindly ask you to inform us of the decision of the competent authorities of the United States of America on our request.

We suggest using 'Interpol' and their services for the speedy conclusion of negotiations and secrecy of the operation.

We enclose herewith the request for extradition of the Prosecutor General of the Republic of Bulgaria and the relevant documents.

The Ministry of Justice of the Republic of Bulgaria avails itself of this opportunity to renew to the Department of Justice of the United States of America the assurances of its highest consideration.

**FOR MINISTER OF JUSTICE:**

**SABRIE SAPUNDZHIEVA**

Зам.-министър:
С. САПУНДжиева
Заповед за заместване 25-02-2009
№ ЛС-04-150
От 20.02.09г. до 23.02.09г.

DISTRICT
POLICE DIRECTORATE
STARA ZAGORA
DEPARTMENT
KIAD

Ref No 22088 / 03.11.2005
Copy No 1

TO THE DIRECTOR
OF THE DEPARTMENT"CRIMINAL POLICE"
OF THE DISTRICT POLICE DIRECTORATE
STARA ZAGORA

To the attention of ST.STOYANOV

Your Ref No. 21969 / 02.11.2005

We would like to inform you that: in Service „Customs and Passport Control" the person
TSVETOMIR SIMEONOV SIMEONOV, Civil ID ████████, the dates of his latest travels
abroad are registered as follows:

**Leaving:**
25.11.1996 , at 12:00
„Customs and Passport Control"
at border "Gueshevo"

**Entering:**
29.07.2001 at 14:00
„Customs and Passport Control"
at border "Kalotina"

DIRECTOR
OF THE DEPARTMENT 'KIAD'
AT THE DISRTICT
POLICE DIRECTORATE
STARA ZAGORA
Major Kolyo Trifonov
/signature/

Round stamp - THE DISTRICT POLICE DIRECTORATE STARA ZAGORA
Apostille

THE PROSECUTOR'S OFFICE OF THE REPUBLIC OF BULGARIA
certifies the truthfulness of the signature and the seal
affixed on present document pursuant to Article 4 of the Rules on legalization,
certification and translation of documents and other papers
Sofia, 12.09.2007
Signed: signature is illegible

The undersigned verifies the truthfulness of the translation, accomplished by me.
The translation consists of 1 / one / page.
Translator: Nevena Georgieva Martinska Civil ID 6107206277

EXT-SIMEONOV-00056

РЕГИОНАЛНА ДИРЕКЦИЯ НА
ВЪТРЕШНИТЕ РАБОТИ
СТАРА ЗАГОРА
СЕКТОР - КИАД

Рег. № _____ Екз.№ 1

ДО
НАЧАЛНИКА НА
СЕКТОР " КРИМИНАЛНА ПОЛИ...
РДВР СТАРА ЗАГОРА

На вниманието на Ст.Стоян...

На Ваш рег. № 21965 ...

Уведомяваме Ви, че в АИС " Граничен контрол " към дата 03...
за лицето ЦВЕТОМИР СИМЕОНОВ СИМЕОНОВ с ЕГН 72...
регистрирани следните данни за последни задгранични пътувания.

| ИЗЛИЗАНЕ | | | ВЛИЗАНЕ | | |
|---|---|---|---|---|---|
| Дата: | Час: | ГКПП: | Дата: | Час: | ГКПП: |
| ... 996 | 12 | ГКПП ГЮЕШЕВО | 29.07.2001 | 14 | ГКПП КАЛОТИНА ... |

НАЧАЛНИК НА
СЕКТОР " КИАД
Майор ..................
/ Кольо Трифонов

ПРОКУРАТУРА НА
РЕП... ...А БЪЛГАРИЯ
удостоверя...........
положения .............
настоящия д..............
чл. 4 от П..............

EXT-SIMEONOV-00057

Certified translation from Bulgarian into English language

## SUPREME PUBLIC PROSECUTOR'S OFFICE OF CASSATION
## INTERNATIONAL LEGAL ASSISTANCE DEPARTMENT
### Sofia 1061, 2 Vitosha blvd., tel: 359 2 / 92 19 330
### Fax : 359 2 / 988 58 95
### e-mail: mpp_vkp@prb.bg

Ref No 10188 / 2006  IV
(Please quote in all your correspondence)
Sofia, 11.08.2007

TO

**Mr. ALBERTO GONSALES**
**MINISTER OF JUSTICE OF THE**
**UNITED STATES OF AMERICA**

## LETTER OF REQUEST

## FOR EXTRADITION

By

Chief Prosecutor of the Republic of Bulgaria, Sofia
Concerning extradition of Tsvetomir Simeonov Simeonov
At present on the territory of the United States of America
Pursuant to the Contract of Surrender between the Republic of Bulgaria
And the United States of America from 1924 and the Convention
Of the United Nations against International Organized Crime

Dear Mr. Gonsales,

Mr. Tsvetomir Simeonov Simeonov is a citizen of the Republic of Bulgaria.

Mr. TSVETOMIR SIMEONOV SIMEONOV, was born on ▮▮▮▮▮ in the town of Kazanlak, the Republic of Bulgaria, his Civil ID is ▮▮▮▮▮, last residence - the town of Kazanlak, 42 "Raiko Alexiev" street. He was convicted of a crime as follows:

Mr. Tsvetomir Simeonov Simeonov was found guilty for a crime of general character – trial No 317 / 2002 and given a sentence No 95-Z on 19.11 2004, which came into force from 22.12.2004.

He was sentenced for the following:

      - 5 year sentence- imprisonment at the initial general routine, pursuant to Article 337, paragraph 1, connected with Article 20, paragraph 2 of the Criminal Code of the Republic of Bulgaria for the fact that: on 20.12.2001 in the town of Kazanlak, with the participation of Roumen Nikolov Yorgov, Simeonov remanufactured and repaired in appropriate way weapon – gas pistols and guns - trade mark "Baikal", caliber 9 X 18, numbers 2791, 2883, 2553, 2689 so that he made them into military guns, without having a legal permission by the competent authorities.

      - 5 year sentence- imprisonment at the initial general routine, pursuant to Article 339, paragraph 1, connected with Article 20, paragraph 2 of the Criminal Code of the Republic of Bulgaria for the fact that: on 20.12.2001 in the town of Kazanlak, with the participation of Roumen Nikolov Yorgov, as a criminal, he gained and held fire weapon - gas pistols and guns - trade mark "Baikal", caliber 9 X 18, numbers 2791, 2883, 2553, 2689, remanufactured and repaired into military guns, as well as 5 ball cartridges for AK, 4 ball cartridges caliber 9 X 18 mm and 1 ball cartridge caliber 6,35 mm, without having a legal permission by the competent authorities.

**Pursuant to Article 23 paragraph 1 of the Criminal Code of the Republic of Bulgaria, the sentence, given by the Court, was totally 5 year sentence - imprisonment at the initial general routine.**
**Pursuant to Article 24 of the Criminal Code of the Republic of Bulgaria the Court changed the sentence and prolonged it with ½, and thus the total sentence was 7 years and 6 months.**

Pursuant to Article 82, paragraph 4, connected with paragraph 1, item 3 of the Criminal Code of the Republic of Bulgaria, the legal limitation of the above mentioned sentence, given to Tsvetomir Simeonov Simeonov, is 22.12.2019.

According to an agreement, signed on 07.02.2000, by the Regional Court – the town of Kazanlak, concerning a crime of general character – trial No 630 / 1998, Mr. Tsvetomir Simeonov Simeonov was found guilty for the fact that: on 25.05.1998 in the town of Kazanlak, after deliberate agreement and appointment with Nikolay Stefchov Nedelchev and Daniel Petkov Kolev, used vehicle – a car BMW No CT 5221 CT, and altogether became perpetrators of the following crime: they took another movable properties – machine units -

totally at the cost of 7757,10 (seven thousand seven hundred and fifty-seven levs and ten stotinki), from their owner "M+C Hydravlic" - Kazanlak, with wrongful intention to appropriate them – a crime pursuant to Article 195, paragraph 2, connected with paragraph 1, item 4 and item 5 of the Criminal Code of the Republic of Bulgaria.

During the trial process all the damage was recovered and because of that Tsvetomir Simeonov Simeonov was sentenced for a crime pursuant to Article 197, item 4, connected with Article 195, paragraph 2, connected with paragraph 1, item 4 and item 5 of the Criminal Code of the Republic of Bulgaria. **The sentence was one year and a half imprisonment. Pursuant to Article 66, paragraph 1 of the Criminal Code of the Republic of Bulgaria the implementation of the sentence was cancelled for the period of 4 years.**

The sentence came into force on 07.02.2000.

After the sentence, given by the Regional Court- Kazanlak, came into force on 22.12.2004 / concerning the trial of a crime of general character No 317 / 2002 /, **with a protocol determination, given by the Regional Court - Kazanlak on 02.03.2005 / concerning the trial of a crime No 14 / 2005 /, and pursuant to Article 68, paragraph 1 of the Criminal Code of the Republic of Bulgaria, the Court ordered: Tsvetomir Simeonov Simeonov must separately serve the term of imprisonment for the period of one year and a half detention,** ordered by the Regional Court- Kazanlak with the agreement signed on 07.02.2000 / concerning a crime of general character – trial No 630 / 1998 / for a crime pursuant to Article 197, item 4, connected with Article 195, paragraph 2, connected with paragraph 1, item 4 and item 5 of the Criminal Code of the Republic of Bulgaria, which implementation had been cancelled, pursuant to Article 66, paragraph 1 of the Criminal Code of the Republic of Bulgaria, for the period of 4 years.

The protocol determination, given by the Regional Court - Kazanlak on 02.02.2005, concerning the trial of a crime No 14 / 2005, came into force on 17.03.2005.

Pursuant to Article 82, paragraph 4, connected with paragraph 1, item 4 of the Criminal Code of the Republic of Bulgaria, the legal limitation of the above mentioned sentence / the protocol determination, given by the Regional Court - Kazanlak on 02.03.2005, concerning the trial of a crime No 14 / 2005 / to Tsvetomir Simeonov Simeonov, is 17.09.2012.

The sentence No 95-Z, given on 19.11 2005 by the Regional Court - Kazanlak, for a crime of general character – trial No 317 / 2002, as well as the protocol determination, given by the Regional Court - Kazanlak on 02.02.2005, concerning the trial of a crime No 14 / 2005 for the implementation of the punishment, require declaring the person for international circulation in order to institute an inquiry, further arrest and subsequent extradition - these were ordained in the presence of an attorney, and the absence of the convicted offender Tsvetomir Simeonov Simeonov, pursuant to article 268 paragraph 3, item 3 of the Criminal Procedure Code of the Republic of Bulgaria, as he left illegally the country.

The order, pursuant to Article 422, paragraph 1, item 6, connected with Article 423 Paragraph 5, of the Criminal Procedure Code of the Republic of Bulgaria, gives the right to be sentenced a convicted offender at his absence, and the country, where he is transferred, has the right to renew the trial against him, and the Court legally renews it, no matter of the fact that the person is informed or not informed about the inquiry against him.