## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE EXTRADITION OF TSVETOMIR SIMEONOV | )<br>)<br>) | No. 19 CR 344<br><br>Magistrate Judge Finnegan |

### MEMORANDUM OPINION AND ORDER

The Government of the Republic of Bulgaria ("Bulgaria") requests the extradition of Defendant Tsvetomir Simeonov pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Bulgaria, and the Agreement on Certain Aspects of Mutual Legal Assistance in Criminal Matters Between the Government of the United States of America and the Government of the Republic of Bulgaria (collectively, the "Treaty"). U.S.-Bulg., Sept. 19, 2007, S. Treaty Doc. No. 110-112 (2008). Mr. Simeonov objects to extradition, arguing that Bulgaria's request does not provide all of the necessary information required by the Treaty, and that extradition is improper given his pending asylum petition.

This Court has carefully considered the relevant Treaty provisions, the exhibits submitted by Bulgaria in support of its extradition request, and the written submissions from the Government and Mr. Simeonov. For reasons set forth here, this Court overrules Mr. Simeonov's objections and finds that all the requirements for extradition have been satisfied. The Court therefore will certify this case to the U.S. Secretary of State for further consideration.

### BACKGROUND

Bulgarian authorities arrested Mr. Simeonov on December 20, 2001 after finding Makarov pistols (military firearms) and related paraphernalia in his home. Mr. Simeonov

was charged with (1) unlawfully remanufacturing and repairing gas pistols into firearms, in violation of Article 337, paragraph 1 of Bulgaria's Criminal Code (the "Code"), and (2) unlawfully acquiring and holding remanufactured firearms and ammunition, in violation of Article 339, paragraph 1 of the Code. (Complaint, Group Ex. 1, EXT-SIMEONOV-00203-04). After attending his first five court hearings, Mr. Simeonov stopped appearing for further proceedings, though he continued to be represented by counsel. (*Id.* at 225). The Bulgarian court proceeded in his absence, hearing testimony from a witness who said he sold gas pistols to Mr. Simeonov two days before the arrest, as well as from a ballistics expert who said those same gas pistols had been remanufactured into firearms capable of shooting live ammunition. (*Id.* at 169, 172-77, 187-88, 198-202, 206).

On November 19, 2004, the Bulgarian court found Mr. Simeonov guilty of both firearms charges and sentenced him to 7 years and 6 months in prison. (*Id.* at 72-74). By that time, Mr. Simeonov had fled to the United States and so has not served any portion of his sentence. (*Id.* at 114). On January 4, 2006, the Bulgarian court issued an Order of Detention for Mr. Simeonov. (*Id.* at 131-32). On or about April 26, 2019, Mr. Simeonov was arrested in Chicago pursuant to a complaint filed at Bulgaria's request seeking extradition under the Treaty. The Government has filed a brief in support of extradition, and Mr. Simeonov has filed one in opposition.

## DISCUSSION

### I. Standard of Review

"Extradition is primarily an executive function, with the court playing a defined and limited role." *Matter of Extradition of Noeller*, No. 17 CR 664, 2018 WL 1027513, at *6 (N.D. Ill. Feb. 23, 2018). An extradition proceeding is not a trial on the merits but is instead

similar to a preliminary hearing in a criminal matter. *Bovio v. U.S.*, 989 F.2d 255, 259 (7th Cir. 1993). "Extradition hearings 'embody no judgment on the guilt or innocence of the accused but serve only to insure that his culpability will be determined in another and, in this instance, a foreign forum.'" *Noeller v. Wojdylo*, 922 F.3d 797, 804 (7th Cir. 2019) (quoting *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976)). *See also In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 940-41 (N.D. Ill. 2011) (citing *Collins v. Loisel*, 259 U.S. 309, 316 (1922)) ("Recognizing the right of the accused to have a plenary hearing and trial in the United States would compel the demanding government to produce all of its evidence on American soil, . . . subjecting them not only to the difficulties of an unfamiliar system but also the demands of transporting physical evidence and witnesses."). Extradition will be denied when the request consists of "mere conclusory allegations unsupported by substantive evidence." *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006).

"If the judicial officer concludes that the extradition requirements have been met, the officer 'shall certify the same' to the Secretary of State for a warrant to issue for the surrender of the requested person." *Matter of Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *2 (N.D. Ill. Oct. 3, 2018) (quoting 18 U.S.C. § 3184). "[T]he decision whether the fugitive should be turned over to the requesting country rests entirely with the Secretary of State." *Id.* In that regard, "[i]t is up to the Secretary of State, not the court, to weigh any defenses the fugitive raises touching on international relations, such as 'contentions that the extradition is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds.'"

3

*Id.* (quoting *Matter of Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *2 (N.D. Ill. Dec. 19, 2017)).

## II. Requirements to Certify Extradition

Extradition is appropriate where the Court makes the following findings: (1) the judicial officer has jurisdiction to conduct an extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the person before the Court is the fugitive named in the request for extradition; (4) there is an extradition treaty in full force and effect; (5) the crimes for which surrender is requested are covered by that treaty; and (6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought. *Matter of Extradition of Cruz*, No. 16 CR 283, 2016 WL 6248184, at *2 (N.D. Ill. Oct. 26, 2016) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). Mr. Simeonov does not disagree that all of these factors are satisfied here.

To begin, "federal magistrate judges are specifically included among the judicial officers authorized by the extradition statute to consider extradition, and there is no dispute that [Mr. Simeonov] was found and is now in custody within this district, giving this Court personal jurisdiction to determine whether he is subject to extradition." *Matter of Extradition of Schumann*, 2018 WL 4777562, at *3. In addition, Bulgaria submitted photographs, fingerprints, and other identifying information for Mr. Simeonov demonstrating that he is the individual named in the request for extradition. (Complaint, Group Ex. 1, EXT-SIMEONOV-00134-36, 140-44).

The fourth and fifth factors are satisfied based on the uncontested declaration from an Attorney Adviser in the Office of the Legal Adviser for the Department of State attesting that the Treaty is in full force and effect between the United States and Bulgaria, and that

4

the offenses for which Mr. Simeonov's surrender is requested are covered by the Treaty. (*Id.* at 1-2). *See also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Matter of Extradition of Schumann*, 2018 WL 4777562, at *3. The Government also provided a detailed analysis explaining how the criminal conduct in question is an extraditable offense under the Treaty since it would violate federal and Illinois law had it been committed in the United States. (Doc. 17, at 7-10) (citing *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113-14 (7th Cir. 1997)) ("If the acts of the accused are considered criminal in both nations, extradition follows."). Mr. Simeonov does not challenge any of this evidence.

Finally, this Court finds sufficient evidence to support a finding of probable cause with respect to the firearms offenses for which extradition is sought. "[P]robable cause will be found where there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Matter of Extradition of Cruz*, 2016 WL 6248184, at *3. *See also In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884 ("[C]ourts apply a totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances . . ., there is a fair probability that the defendant committed the crime.") (internal quotations omitted). The Federal Rules of Evidence and Criminal Procedure do not apply to an extradition proceeding so the court may rely on hearsay evidence. *Bovio*, 989 F.2d at 259. In addition, the accused is not permitted to "contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981).

Bulgaria has submitted evidence showing that on December 19, 2001, officers of the Fight Against Organized Crime Unit ("FAOCRO") in Kazanlak, Bulgaria, received information that Mr. Simeonov and an individual named Rumen Nikolov Yorgov would be selling Makarov pistols outside the town of Kazanlak. Mr. Simeonov and Mr. Yorgov previously were known to FAOCRO as participants in channels for exporting, producing, and selling weapons parts in different regions of the country. (Complaint, Group Ex. 1, EXT-SIMEONOV-00203). The next day, on December 20, 2001, officers from FAOCRO and the Kazanlak Regional Police raided Mr. Simeonov's house in Kazanlak. (*Id.*). The officers found Mr. Simeonov and Mr. Yorgov in the basement cleaning disassembled parts of Makarov pistols. (*Id.* at 82, 203, 205). The officers arrested both men and seized pieces of firearms, ammunition, various tools and equipment, and packages of white and yellow substances. (*Id.* at 81, 172, 187, 203). The officers also made a video recording showing a detailed view of the room in Mr. Simeonov's house where the firearms materials were seized. (*Id.* at 83, 202). There are photographs of those seized materials as well. (*Id.* at 187-88).

During the criminal proceedings, a forensic chemist testified that the white substance was used for oxidation. (*Id.* at 82, 200). The prosecution established that the components used to create the four seized weapons were remanufactured from Baikal gas pistols, whose gas tubes had been removed and replaced with rifle barrels designed for Makarov pistols. (*Id.* at 169, 172-77, 187-88). A ballistics expert was able to assemble the weapons components found in Mr. Simeonov's basement into four pistols capable of shooting ammunition and striking down live targets. (*Id.* at 82, 172-76, 177-78). The expert testified, and the Bulgarian court found, that the weapons required only a few

additional repair works to become fully ready for use, and that only minimal knowledge of the structure of Makarov pistols was necessary to create a firearm with the tools Mr. Simeonov had in his possession. (*Id.* at 82, 172-74). The expert further found traces of metalworking on some of the seized items and confirmed that the factory-set serial numbers (2689, 2873, 2791, and 2553) had been removed from the pistols. (*Id.* at 82, 84).

Peter Savov, a gun shop owner, testified that Mr. Simeonov and Mr. Yorgov purchased gas pistols with serial numbers 2689, 2873, 2791, and 2553 from his shop two days before the December 20, 2001 arrest. (*Id.* at 82, 199, 206). Mr. Savov provided a physical description of Mr. Simeonov and noted that he had purchased approximately 25 pistols from Mr. Savov's store over a three-to-four month period in 2000-2001. (*Id.* at 199). Mr. Savov also testified that Mr. Simeonov told him that he was buying the air guns in order to sell them. (*Id.* at 207). According to the Control of Hazardous Means Unit, the Bulgarian governmental entity that maintains information concerning permits for firearms and ammunition, Mr. Simeonov did not have a permit to engage in activities involving firearms and ammunition. (*Id.* at 179, 230-31, 233).

On November 19, 2004, the Bulgarian court found Mr. Simeonov guilty *in absentia* of unlawfully remanufacturing and repairing gas pistols into firearms, and unlawfully acquiring and holding remanufactured firearms and ammunition in violation of Article 337, paragraph 1 and Article 339, paragraph 1 of Bulgaria's Criminal Code. (*Id.* at 72-74, 81-88). The court concluded that Mr. Simeonov and Mr. Yorgov were co-conspirators and sentenced Mr. Simeonov to 7 years and 6 months in prison. (*Id.* at 59, 72-74, 83-84).

This Court finds that the above evidence is sufficient to support a finding of probable cause as to Mr. Simeonov's guilt of the firearms offenses for which Bulgaria is seeking his extradition. *See In Matter of Extradition of Yusev*, No. 12 M 727, 2013 WL 5979678, at *4 (N.D. Ill. Oct. 29, 2013) (fugitive's decision to flee from Bulgaria to the United States "permits an inference of guilt," and his conviction "*in absentia* supports a finding of probable cause in and of itself."). Mr. Simeonov does not disagree or provide any contrary evidence or argument on this point.

### III.  Mr. Simeonov's Objections

Though all of the requirements for extradition have been met, the Court's inquiry is not over because Mr. Simeonov raises three other objections to Bulgaria's extradition request. He first argues that Bulgaria has failed to provide information regarding the statute of limitations for his crimes and the circumstances of his absence from the criminal proceedings as required under Articles 8(2)(d) and 8(4)(e) of the Treaty. He also insists that extradition is improper given his pending asylum application. As explained below, none of these objections has merit.

#### A.  Article 8(2)(d): Statement Regarding Statute of Limitations

Article 8(2)(d) of the Treaty requires Bulgaria to identify "the text of the law or laws describing any time limit on the prosecution or execution of a penalty and a statement describing the application of such law or laws to the offense for which extradition is sought." (Complaint, Group Ex. 1, EXT-SIMEONOV-00035). Mr. Simeonov concedes that Bulgaria provided "the text of the laws alleged to have been violated," but claims it has not provided "any statements regarding the Statute of Limitations in Bulgaria to either

have brought the charges in the first place and more importantly, the time limitations on imposing the sentence." (Doc. 26, at 2). This is not accurate.

Bulgaria's submission includes a statement that Mr. Simeonov's sentence of 7 years and 6 months came into force on December 22, 2004, and that the limitations period on that sentence will expire on December 22, 2019. (Complaint, Group Ex. 1, EXT-SIMEONOV-00053, 59, 74). Bulgaria also provided a copy of Articles 82(1)(3) and 82(4) of the Bulgarian Criminal Code, which together set forth a 15-year limitations period for Mr. Simeonov to begin serving his sentence. Specifically, Article 82(1)(3) states that "[t]he punishment imposed shall not be served where the following terms have elapsed: . . . 3. ten years, if the punishment was deprivation of liberty from three to ten years." (*Id.* at 158). Article 82(4) further provides that "[i]rrespective of the interruption and termination of prescription, the punishment shall not be enforced where a term has elapsed which exceeds the term provided in paragraph (1) by one half." (*Id.* at 159). Bulgaria explains that the 15 years is derived from the 10 years under Article 82(1)(3), plus an additional 5 years (one-half of the 10 years) under Article 82(4). (*Id.* at 53, 59, 74).

Mr. Simeonov does not dispute this information, which demonstrates that the statute of limitations for him to start serving his sentence has not yet expired. The Court finds that Bulgaria has satisfied the requirements of Article 8(2)(d) of the Treaty.

### B. Article 8(4)(e): Statement of Circumstances Regarding Absence from Proceedings

Mr. Simeonov next argues that Bulgaria has not provided the necessary information regarding the circumstances of his absence from the criminal proceedings. Article 8(4)(e) of the Treaty states: "[A] request for extradition relating to a person who has been convicted or found guilty of the offense for which extradition is sought shall also

9

be supported by: . . . (e) in the case of a person who has been convicted or found guilty <u>in absentia</u>, information regarding the circumstances under which the person was absent from the proceedings." (Complaint, Group Ex. 1, EXT-SIMEONOV-00036-37) (emphasis in original). Mr. Simeonov agrees that Bulgaria has "laid out the basic procedural history of this case" but identifies a host of information he claims is "critically missing." (Doc. 26, at 3). According to Mr. Simeonov, there are no transcripts, no details about the nature of the proceedings, no information as to "who, if anyone, testified," no indication as to whether he was represented by counsel, no statement as to whether it was a bench or jury trial, and no explanation for the sentence imposed. (*Id.*). In Mr. Simeonov's view, "[w]e know nothing about the proceedings" against him and "are left to simply presume that this formerly Communist country and a satellite of the USSR afforded [him] all of the due process safeguards that we would ensure took place in the United States for somebody who absented himself from the proceedings." (*Id.*). Relatedly, Mr. Simeonov questions whether he was "formally advised of the consequences of his absence." (*Id.* at 4).

As discussed previously, Bulgaria has provided much more information regarding the criminal proceedings than Mr. Simeonov acknowledges, including witness and expert testimony, a ballistics report, and the written ruling from the Bulgarian court. (Complaint, Group Ex. 1, EXT-SIMEONOV-00198-207, 225-26). Moreover, this Court declines to construe the Treaty language as requiring Bulgaria to provide the extensive "due process" information Mr. Simeonov requests. The phrase "information regarding the circumstances under which the person was absent from the proceedings" is at best ambiguous, and the Seventh Circuit has instructed that "[e]xtradition treaties 'should be

liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.'" *Noeller*, 922 F.3d at 803 (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 293 (1933)). *See also U.S. v. Trabelsi*, 845 F.3d 1181, 1191 (D.C. Cir. 2017) ("[C]ourts should be especially reluctant to read conditions into a treaty that would render extradition more difficult.").

Bulgaria has presented evidence that Mr. Simeonov attended his first five court hearings in the presence of defense counsel on December 27, 2001, March 11, 2002, May 8, 2002, June 27, 2002, and October 14, 2002. (Complaint, Group Ex. 1, EXT-SIMEONOV-00225). During the course of those hearings, Mr. Simeonov was presented with the decision placing him under criminal investigation as a suspect, and was questioned by the investigating authority. (*Id.*). He also read the investigation file, and was presented with both a decision pressing charges against him and all the materials gathered during the preliminary pretrial proceedings. In addition, Mr. Simeonov attended the first court hearing under the public criminal case and requested and received the opportunity to obtain another defense lawyer. (*Id.*). He was further present at the October 14, 2002 hearing at which "almost all evidence was gathered under the case." (*Id.*).

After October 14, 2002, Mr. Simeonov stopped showing up for hearings but his defense attorney continued to appear on his behalf. (*Id.* at 225-26). On February 10, 2003, a nationwide search warrant issued for Mr. Simeonov. (*Id.* at 225). The Bulgarian court sentenced Mr. Simeonov "in an open session of the Court" on November 19, 2004. (*Id.* at 72-73). Thereafter, Bulgaria inquired into Mr. Simeonov's international travel history, declared him "for international circulation through Interpol," and learned that he was in the United States. (*Id.* at 56, 61, 146).

This Court finds that Bulgaria has provided sufficient information regarding the circumstances under which Mr. Simeonov was absent from the criminal proceedings to satisfy Article 8(e)(4) of the Treaty. Mr. Simeonov's objection to extradition on that basis is overruled. To the extent Mr. Simeonov has concerns regarding the fairness or integrity of the Bulgarian judicial system in general, or the adequacy of the criminal proceedings against him in particular, they must be addressed by the Secretary of State and not this Court. *Matter of Extradition of Noeller*, 2018 WL 1027513, at *7.

### C. Pending Asylum Petition

Mr. Simeonov finally argues that extradition is inappropriate in this case because his petition for asylum is still pending. He maintains that he sought asylum due to "a very specific fear . . . of being killed by his [mafia-connected] co-defendant [Mr. Yorgov] who had explicitly threatened him and his family if [Mr. Simeonov] did not claim full responsibility for the gas pistols." (Doc. 26, at 5). He further notes that the asylum petition is scheduled to be heard "this coming Fall" and says extradition would "effectively permanently and irreparably negate the [asylum] claims that he has made that deserve to be adjudicated." (*Id.* at 6).

Since this argument does not relate to certification, it must be considered by the Secretary of State, not this Court. *Matter of Extradition of Noeller*, 2018 WL 1027513, at *7. "[A]lthough asylum and extradition proceedings are related insofar as they both bear on whether [a person] will ultimately be forced to return to [his home country], they are rooted in distinct sources of law, governed by procedures specified in distinct statutory regimes, and responsive to different sets of policy concerns." *Castaneda-Castillo v. Holder*, 638 F.3d 354, 361 (1st Cir. 2011). Indeed, "[i]ndividuals who have been granted

an asylum are still eligible for extradition for non-political crimes, just as even United States citizens may be extradited for crimes committed in other countries with whom we have extradition treaties." *Mironescu v. Costner*, 345 F. Supp. 2d 538, 546 (M.D.N.C. 2004). The Seventh Circuit has made clear that arguments against extradition on humanitarian grounds must be addressed by the Secretary of State. *Noeller*, 922 F.3d at 810 (citing *Munaf v. Geren*, 553 U.S. 674, 702 (2008)). *See also In re Extradition of Paberalius*, No. 10 M 275, 2011 WL 2144065, at *4 (N.D. Ill. May 31, 2011) ("Under extradition law, . . . this Court cannot consider the adverse treatment that could await Paberalius [who had applied for asylum] if he were extradited to Lithuania."). Mr. Simeonov has not cited any contrary authority and this Court rejects his assertion that his pending asylum petition supports denying certification of his extradition case to the Secretary of State.

## **CONCLUSION**

For reasons stated above, this Court finds that all the requirements for extradition have been met, and Mr. Simeonov's objections to extradition have no merit. The Court will therefore certify the case to the Secretary of State for further consideration. As instructed in the July 1, 2019 Order, the United States is to submit a proposed Certification of Extradition and Order of Commitment after defense counsel has an opportunity to review it.

ENTER:

Dated: July 9, 2019

*Sheila Finnegan*
SHEILA FINNEGAN
United States Magistrate Judge